UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| JEFFREY KLEIN, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | Case No. 3:20-cv-393 |
| v. | ) | |
| | ) | Judge Atchley |
| PRONOVA SOLUTIONS, LLC, | ) | |
| | ) | Magistrate Judge Poplin |
| *Defendant*. | ) | |

## TRIAL OPINION

This matter came before the Court for a bench trial on February 13, 2024. At issue is whether Defendant ProNova Solutions, LLC ("ProNova") is liable to Plaintiffs for breach of contract. Upon consideration of the evidence presented at trial and the parties' post-trial briefing, the Court finds for Defendant ProNova and concludes that this matter must be **DISMISSED WITH PREJUDICE**.

### I. PROCEDURAL BACKGROUND

On September 1, 2020, Plaintiffs filed this lawsuit against ProNova and two of its corporate officers, Dr. Terry Douglass and Mr. Joseph Matteo. Plaintiffs asserted claims against Defendants for breach of contract, fraud, breach of fiduciary duty, and violation of the Tennessee Consumer Protection Act. [Doc. 1 at ¶ 21–30]. These claims stem from Plaintiffs' $775,000.00 investment in ProNova, which came pursuant to a Private Placement Memorandum ("PPM") and accompanying subscription agreements. [*Id.* at ¶ 7–10].

The Court narrowed the issues remaining for trial through its rulings on multiple dispositive motions. First, the Court granted Defendants' Motion for Partial Dismissal, which resulted in dismissal of Plaintiffs' Tennessee Consumer Protection Act and breach of fiduciary duty claims

on statute of limitations grounds. [Doc. 32 at 3]. Second, and lastly, the Court granted in part and denied in part Defendants' Motion for Summary Judgment. [Doc. 70]. That Order dismissed Plaintiffs' fraud claim and breach of contract claim, but the breach of contract claim was dismissed only as to Individual Defendants Dr. Douglass and Mr. Matteo. [*Id.* at 15]. Remaining for trial, then, was Plaintiffs' claim against ProNova for breach of contract.

## II.    FINDINGS OF FACT

The trial saw testimony from two witnesses—Mr. Patrick Marsh and Dr. Terry Douglass.[1] Mr. Marsh, along with the other five Plaintiffs, invested $775,000.00 in ProNova. [Trial Tr. at 123]. ProNova is in the business of proton therapy, a form of cancer treatment. [*Id.* at 16]. Through their investment in ProNova, Plaintiffs purchased LLC units and gained a membership interest in the company. [Trial Ex. 2]. The 2013 PPM outlined the terms of Plaintiffs' investment and ProNova's business plan. [*Id.*].

Based on the PPM and the testimony at trial, ProNova sought to generate investor returns from three sources: the sale of ProNova proton therapy equipment, maintenance of that same equipment, and development of ProNova Proton Therapy Centers (the "Centers"). [Trial Tr. at 69, 103]. The PPM outlines numerous risk factors that could cut off these potential revenue streams. [Trial Ex. 2 at 20–33]. At the time of Plaintiffs' investment in 2013, ProNova's key piece of equipment, the SC360, had not yet received FDA approval. [Trial Tr. at 59–60]. Other risk factors included that ProNova was a startup company and may not be able to accurately predict its future operating expenses. [*Id.* at 58–59]. Mr. Marsh, having decades of experience in the financial industry, testified that he read and understood these risk factors before deciding to invest. [*Id.* at 13–14, 58]. He acknowledged that the investment was risky. [*Id.* at 57].

---

[1] The parties stipulated that of the six Plaintiffs, only Mr. Marsh and Mr. Klein would offer trial testimony in this case. [Doc. 41]. Mr. Klein was unable to attend trial, meaning that Mr. Marsh's testimony is on behalf of all Plaintiffs.

2

In addition to the risk factors identified, the PPM includes a "Use of Proceeds" section, which explains how ProNova expects to spend the funds it raises. [Trial Ex. 2 at 34]. The section specifically indicates that if ProNova hits its target of raising $76,300,000.00, the company "expect[s] to use the net proceeds for general corporate and working capital purposes and to fund between six (6) ProNova Proton Therapy Centers." [*Id.*]. The PPM allocates $33,000,000.00 towards investments in the Centers, which constitutes the single largest line-item in the Use of Proceeds section. [*Id.*]. According to Mr. Marsh, potential ownership of Centers and the PPM's numerous references to them led him to invest in ProNova. [Trial Tr. at 17].

Notwithstanding the PPM's many discussions of the Centers, the document couches those discussions with cautionary and discretionary language. One of the risk factors listed just before the Use of Proceeds section states that ProNova's management "will have broad discretion in the application of the net proceeds." [Trial Ex. 2 at 32]. Moreover, the Use of Proceeds section only indicates how ProNova "expect[s]" to use the funds raised, and the PPM earlier states that uses of the word "expect" are to signal forward-looking statements that should not be unduly relied upon. [*Id.* at 3, 34]. Regarding this language, Mr. Marsh conceded at trial that the PPM contains no specific promise to open Centers. [Trial Tr. at 67–68].

ProNova ultimately exceeded its target and raised more than $85 million. [*Id.* at 24]. Notwithstanding that accomplishment, ProNova did not invest in or open any Centers. [*Id.* at 90]. Of concern to Plaintiffs is the fact that Dr. Douglass simultaneously serves as Chairman of the Board for Provision Healthcare, LLC, other Provision entities, and ProNova. [*Id.* at 78–79]. Other individuals also served on the boards of Provision entities and ProNova. [*Id.* at 29–30]. It is Plaintiffs' contention that ProNova board members prioritized their roles with Provision Healthcare and invested in Centers with that entity, to the detriment of ProNova. [Doc. 90 at 7–8].

3

Plaintiffs assert that this strategy unfolded without their knowledge. [*Id.* at 9–10]. As Mr. Marsh testified, beyond sending out K-1 forms, ProNova provided him and the other Plaintiffs with no updates after they first invested. [Trial Tr. at 25–26].

Even with the overlapping membership on the boards of Provision entities and ProNova, the entities themselves are different. ProNova is a for-profit entity whereas many of the Provision entities are not-for-profit. [Trial Tr. at 107]. This difference meant that ProNova could not invest in Centers through tax-exempt bond financing; only not-for-profit entities could pursue that method of financing. [*Id.* at 106–08]. Consequently, various not-for-profit Provision entities, rather than ProNova, invested in the Centers in Nashville and Orlando through tax-exempt bond financing. [*Id.* at 90–91, 116]. ProNova did not hold an ownership interest in either of those Centers, and it instead sold two units of its SC360 to those Centers. [*Id.* at 97–98]. Those two sales account for the approximately $85 million ProNova generated.

Though tax-exempt bond financing was unavailable to ProNova, Dr. Douglass testified that he and others made many attempts to launch ProNova Centers. Dr. Douglass explained that ProNova's business model involved selling SC360 units to a provider entity and partnering with that provider entity to invest in and develop the Centers. [*Id.* at 103–04]. According to Dr. Douglass, ProNova had a marketing and sales team that attempted to locate investment partners. [*Id.* at 106]. Dr. Douglass himself traveled to China twenty times, and ProNova developed a prospect list that included approximately three dozen potential investment partners in the United States, Asia, and elsewhere. [*Id.*]. Despite these efforts, ProNova was unable to secure an investment partner. [*Id.*]. Dr. Douglass indicated that market forces dictated this outcome. [*Id.* at 117]. He specifically testified the market was such that tax-exempt bond financing, clearly unavailable to ProNova, provided the only avenue to obtain financing for the Centers. [*Id.*].

Because ProNova did not obtain an investment partner for the Centers, all of the funds it raised were spent on research and development, equipment manufacturing, capital expenditures, administration, and marketing. [*Id.* at 110–11]. Dr. Douglass testified that all funds raised from the 2013 PPM were spent on ProNova and never diverted to another company, such as the Provision entities. [*Id.*]. In fact, Dr. Douglass noted that Provision Healthcare provided a $70 million line of credit to fund ProNova's operations when it was struggling financially. [*Id.* at 101, 111]. And Vision Investments, Dr. Douglass's family partnership, initially invested $37.5 million in ProNova. [*Id.* at 112]. At the same time, as these funds flowed into ProNova, Dr. Douglass testified that he has never cashed out on any of his investments in Provision Healthcare or Vision Investments. [*Id.*].

## III.    APPLICABLE LAW

For a contract to be enforceable under Tennessee law, it must result from a meeting of the minds and be supported by consideration. *Peoples Bank of Elk Valley v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991) (citation omitted). "Consideration may take a number of different forms, including a return promise." *Cumberland Props., LLC v. Ravenwood Club, Inc.*, 2011 WL 1303375, at *9 (Tenn. Ct. App. Apr. 5, 2011) (citing *Est. of Hordeski v. First Fed. Sav. and Loan Ass'n of Russell Cnty., Ala.*, 827 S.W.2d 302, 304 (Tenn. Ct. App. 1991)). "Nonetheless, 'a promise constitutes consideration for another promise only when it creates a binding obligation.'" *Walker v. Ryan's Fam. Steak Houses, Inc.*, 289 F. Supp. 2d 916, 929 (M.D. Tenn. 2003) (quoting *Floss v. Ryan's Fam. Steak Houses, Inc.*, 211 F.3d 306, 315 (6th Cir. 2000)). A promise will not create a binding obligation when it is illusory, meaning it promises nothing at all or allows the promisor to decide whether or not to fulfill the promise. *Id.* (citations omitted). In essence, an illusory promise is one that by its terms makes "performance entirely optional with the

Case 3:20-cv-00393-CEA-DCP   Document 91   Filed 03/05/24   Page 5 of 9   PageID #: 1970

'promisor.'" *Cumberland Props., LLC*, 2011 WL 1303375, at *9 (citing Restatement (Second) of Contracts § 77, cmt. a.)).

Notwithstanding the illusory promise doctrine, courts generally endeavor to avoid its application. *Id.* (citation omitted). To do so, courts will imply a duty of good faith and fair dealing, which Tennessee law recognizes as applicable to every contract. *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 661 (Tenn. 2013) (citations omitted). The implied duty of good faith specifically protects against actions that would prevent the innocent party from receiving the fruits of the contract or the benefit of the bargain. *Evans v. Vanderbilt Univ. Sch. of Med.*, 589 F. Supp. 3d 870, 900 (M.D. Tenn. 2022). "What this duty consists of, however, depends upon the individual contract in each case." *Wallace*, 938 S.W.2d at 686 (quoting *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987)).

To determine whether a party has satisfied its duty of good faith, "the court must judge the performance against the intent of the parties as determined by a reasonable and fair construction of the language of the instrument." *Id.* (citing *Covington v. Robinson*, 723 S.W.2d 643, 645–46 (Tenn. Ct. App. 1986)). Importantly, the duty of good faith "does not extend beyond the terms of the contract and the reasonable expectations of the parties under the contract." *Regions Bank v. Thomas*, 422 S.W.3d 550, 560 (Tenn. Ct. App. 2013) (citations omitted). Though the precise contours of the duty remain unclear, courts often say that it prevents contracting parties from acting in bad faith or pursuing a dishonest purpose. *Dick Broad Co. of Tenn.*, 395 S.W.3d at 674–75 (Koch, Jr., J., concurring) (citations omitted).

## IV.    CONCLUSIONS OF LAW

Plaintiffs offer three arguments as to how ProNova breached its duty of good faith. Their first two arguments are related and take issue with ProNova's lack of investment in the Centers.

6

[Doc. 90 at 5–9]. Specifically, Plaintiffs contend that ProNova violated its duty of good faith when it invested no capital into Centers and instead funded their development through Provision Healthcare. [*Id.*]. Plaintiffs' final argument is that ProNova breached its duty of good faith upon failing to keep investors informed of the company's investment strategies. [*Id.* at 9–10]. For the reasons explained below, none of these arguments establish that ProNova violated its duty of good faith by a preponderance of the evidence.

At the outset, the Court has serious doubts as to whether the PPM contains an enforceable promise to invest in Centers. Courts make clear that a claim for breach of the duty of good faith requires a valid underlying claim for breach of contract. *Berry v. Mortg. Elec. Registration Sys.*, 2013 WL 5634472, at *7 (Tenn. Ct. App. Oct. 15, 2013) (citations omitted). Without an enforceable promise to open Centers, Plaintiffs would lack any valid claim for breach of contract, and their claim based on the duty of good faith would necessarily fail. The Court's doubts on this issue stem largely from Mr. Marsh's own testimony, through which he conceded that the PPM does not promise to open Centers. [Trial Tr. at 67–68]. The PPM's discussion of risk factors and inclusion of cautionary language both lend support to Mr. Marsh's view. That is, the PPM's overall structure suggests that there is no specific promise to invest in or open Centers.

Notwithstanding these concerns, the Court can resolve this case on another ground. In particular, even assuming the PPM contains an enforceable promise to invest in Centers, Plaintiffs failed to prove at trial that ProNova breached its duty of good faith. The scope of ProNova's duty is determined based on a fair reading of the PPM's language. *Wallace*, 938 S.W.2d at 686 (citing *Covington*, 723 S.W.2d at 645–46). That language unequivocally provides ProNova's Board with "broad discretion" over the use of proceeds. [Trial Ex. 2 at 32]. The key question, then, is whether ProNova acted in bad faith when it exercised its "broad discretion" to not invest in Centers.

7

The testimony and evidence at trial did not establish that ProNova acted in bad faith when it failed to invest in Centers. Bad faith usually requires some dishonest purpose or sinister intention, and ProNova's actions fail to clear this threshold. ProNova's failure to invest in Centers appears to be the result of market forces and unsuccessful efforts, not bad faith. At trial, Dr. Douglass explained that market conditions made it such that tax-exempt bond financing, unavailable to for-profit entities such as ProNova, provided the only way to obtain financing for Centers. [Trial Tr. at 117]. Even though market conditions made it difficult for ProNova to obtain financing, the company still made efforts to secure investment partners. ProNova maintained a marketing and sales team, developed a prospect list of approximately three dozen investment partners, and sent Dr. Douglass on twenty trips to China in an effort to generate business. [*Id.* at 106]. These actions are not indicative of a company looking to deprive its investors of their contractual expectations. Rather, these actions suggest that ProNova made many efforts to invest in Centers, but those efforts simply proved unsuccessful.

That Provision entities invested in Centers instead of ProNova does not prove bad faith, either.[2] It is true that Dr. Douglass and others served on the boards of Provision entities and ProNova. [*Id.* at 29–30]. But this arrangement is insufficient standing alone to establish a lack of good faith. It seems more likely to the Court that Provision entities invested in Centers rather than ProNova because of the market conditions discussed above, not because Dr. Douglass and others had nefarious intentions to undermine ProNova. After all, Provision entities invested in and loaned millions of dollars to ProNova, including when Provision Healthcare provided ProNova with a $70 million line of credit to fund the then-struggling company's operations. [*Id.* at 101, 111]. This level

---

[2] Plaintiffs specifically contend that ProNova breached the duty of good faith when it "chose to invest in centers with another company, Provision Healthcare LLC." [Doc. 90 at 7]. However, it does not appear that Provision Healthcare had an ownership interest in either the Nashville or Orlando Centers. Those Centers were instead owned by other not-for-profit Provision entities, such as Provision Trust. [Trial Tr. at 91].

of financial support undermines Plaintiffs' theory that various board members prioritized the interests of Provision entities over ProNova's. It would make little sense for Provision entities to financially support ProNova while simultaneously working to outmaneuver and harm the company. For these reasons, the duty of good faith was not breached simply because ProNova did not invest in Centers while various Provision entities did.

Nor did ProNova breach the duty of good faith based on its alleged failure to keep investors informed. Though Mr. Marsh testified that ProNova provided him with no updates after he invested, there were no documented instances of Plaintiffs being denied access to information they requested. [*Id.* at 25–26]. Moreover, Dr. Douglass testified that ProNova never informed its investors that it would not be investing in Centers because the company was and still is willing to do so. [*Id.* at 99–100]. Based on the evidence presented at trial, the Court declines to conclude that ProNova acted in bad faith because of Plaintiffs' general allegation regarding a lack of transparency.

## V. CONCLUSION

The Court can understand Plaintiffs' frustration. They made an investment with major aspirations only to see it not turn out as they had hoped. Still, personal dissatisfaction does not rise to the level of bad faith. Considering the entire record and the evidence presented at trial, Plaintiffs have failed to prove by a preponderance of the evidence that ProNova breached the duty of good faith. Accordingly, this matter is **DISMISSED WITH PREJUDICE**.

**SO ORDERED.**

*/s/ Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**